**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| ADAM THOMAS GRAY | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 12-C-1743 |
| v. | ) | |
| | ) | Honorable Milton I. Shadur |
| JOSEPH YURKOVICH, Warden, | ) | |
| | ) | |
| Respondent | ) | |

**MEMORANDUM IN SUPPORT OF TIMELINESS**
**OF PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner ADAM THOMAS GRAY, by his attorneys R. Douglas Rees and Brij Patnaik, JENNER & BLOCK, LLP, and Tara Thompson and Rule 711 Law Students Casey Potter and Julia Kasper, THE EXONERATION PROJECT AT THE UNIVERSITY OF CHICAGO LAW SCHOOL, hereby submits this memorandum in support of the timeliness of his Petition for Writ of Habeas Corpus. The Court should find that Adam's Petition is timely and all his claims should be heard because it is predicated on newly-discovered evidence that establishes that he is actually innocent. The Court also should find that fairness weighs in favor of granting a stay in contemplation of the development of further evidence in proceedings in Illinois state court.

**INTRODUCTION**

Adam Gray was convicted in 1996 of setting a fire at the two-flat apartment building at 4139 S. Albany Avenue in Chicago that caused the deaths of the two residents of the upstairs unit. The State's theory of the case at trial was based on the confession fourteen-year-old Adam gave to police the morning after the fire, in which he said he carried gasoline to the building in a plastic milk jug, lit it with a cigarette lighter, then fled down the alley behind the building and threw the milk jug there. Following Adam's confession, police located a milk jug in the alley

1

and submitted the jug and debris samples taken from the rear wood stairs of the building for chemical analysis. A chemistry test called "gas chromatography" revealed that both contained residue from "heavy petroleum distillates," or "HPDs."[1]

Adam's Petition for Writ of Habeas Corpus (the "Petition") presents new evidence that – contrary to the perception created at trial – heavy petroleum distillates simply are not gasoline and the gas chromatography results actually prove that no gasoline was in either the debris or the milk jug. The Petition also presents evidence based on a newly-developed method for analyzing gas chromatography data that the specific type of HPD found in the debris is not the same as that found in the milk jug.

These facts were previously unavailable to Adam both because the method of analyzing gas chromatography data that enables chemists to make distinctions among HPDs is new and because the State never disclosed the data from the testing performed in Adam's case at trial, despite Adam's counsel's specific request in discovery for "any report and results of any and all scientific tests."[2] Adam obtained the chromatography data for the first time only through a Freedom of Information Act request in the summer of 2010. Adam then contacted both the Chicago Police Department Crime Lab analyst who performed the tests, Murray Shambee, and chemistry experts John Lentini and Dr. Gerald Hurst and asked them to review the data. Mr. Shambee signed an affidavit in May 2011 acknowledging that the data shows no gasoline was present, and Mr. Lentini and Dr. Hurst – fire investigators and chemists at the forefront of their field – subsequently provided affidavits explaining that the HPDs do not match. Adam obtained

---

[1] The term "heavy petroleum distillate" is the more common term for what was referred to at trial as a "high boiling petroleum distillate." (*See* Ex. 1, Shambee Aff. at ¶ 6.)

[2] The State disclosed only two single-page reports stating Mr. Shambee's opinions as to what the results of the tests showed. (*See* Dkt. 1 at 14.)

these affidavits in the year prior to filing his Petition and thus they are timely predicates for his claims under the habeas statute of limitations. 28 U.S.C. § 2244(d).

This new evidence – as well as a host of other evidence based on advances in arson science and new testimonial evidence that has been collected over the course of several years – establishes that Adam's confession cannot have been true and that, as explained below, there is no basis in the physical evidence to believe that an arson occurred at all.

The evidence as a whole now shows that Adam is actually innocent – that no reasonable juror hearing the case today would convict – and thus that all of the claims in his Petition are entitled to pass collectively through the "innocence gateway" that permits otherwise-barred constitutional claims to be heard on habeas review. *Schlup v. Delo*, 513 U.S. 298, 315 (1995). While the Seventh Circuit has held that a showing of innocence sufficient to invoke the gateway does not by itself excuse a habeas petitioner from complying with the statute of limitations, the Court has also distinguished between such a "freestanding exception" to the statute of limitations and a petition demonstrating innocence through newly-discovered evidence. *Araujo v. Chandler*, 435 F.3d 678, 681 (7th Cir. 2005); *Escamilla v. Jungwirth*, 426 F.3d 868, 871 (7th Cir. 2005). Adam's Petition falls into the latter category and thus should be heard in its entirety. Alternatively, even if the Court finds that Adam's Petition cannot pass through the innocence gateway as a whole, it still should find that each of his claims is individually timely because they are based either on the new chemistry evidence or pending Supreme Court decisions.

## SUMMARY OF EVIDENCE AT TRIAL

The evidence presented at trial is described in the Petition at pages 8-10. (Dkt. 1.) A shorter overview is provided here to illustrate the significance of the new evidence.

The principal evidence presented by the State at trial was (1) Adam's confession, given after approximately six hours of early-morning interrogation without his mother or brother present, that he had taken a milk jug to a Clark gas station, bought $2 of gasoline from "a black lady," used it to start the fire, then run down the alley behind Albany Avenue past "some guy" and thrown the milk jug by a concrete slab; (2) the testimony of a Clark station attendant, Brenda Thomas, that Adam had purchased $2 of gasoline from her the night of the fire; (3) the testimony of CPD Detective Nicholas Crescenzo that he found a milk jug smelling of gasoline where Adam confessed to have discarded one; (4) the testimony of CPD crime lab analyst Murray Shambee that the milk jug and debris from the rear porch stairs contained residue from a "high boiling petroleum distillate," and that this was an accelerant; (5) the testimony of Fire Marshal Joseph Gruszka and Detective Ernest Rokosik that burn patterns indicated the fire was caused by an accelerant poured on the rear stairs; (6) the testimony of a fourteen-year-old peer of Adam's who lived in the first-floor apartment at 4139 S. Albany, Kasey Paris, that Adam had threatened her in the months leading up to the fire; and (7) the testimony of a friend of Paris' brother, Karrie Kelly, that she had seen Adam run past her down the alley behind 4139 S. Albany near the time of the fire.

The prosecution argued in opening and closing that the fire was started using gasoline and that the physical evidence corroborated the confession.

The witnesses presented by the defense at trial were Adam's friend Mel Gonzalez, his sister Rosemary Gonzalez, and his mother Lita Gonzalez. The Gonzalezes all testified that Adam had gone to sleep on the sofa in their living room – where Mel and his brother also had slept – the night of the fire and that they had not heard him get up or leave the house. Adam's mother and brother also testified that they had gone to the police station and waited there for

several hours while Adam was being interrogated but had not been allowed to see him. While Adam's attorneys impeached some of the testimony of the State's witnesses described above on cross-examination, they did not present any evidence that contradicted it.

## NEW EVIDENCE PRESENTED IN THE PETITION

Adam's Petition is predicated on the newly-discovered facts that no gasoline was in the fire debris or the milk jug and that the HPD in the debris did not come from the HPD in the milk jug. These facts are two of several important discoveries that establish that fourteen-year-old Adam's confession cannot have been true and that he was convicted of a crime he did not commit.

No testimony was presented at trial explaining the critical fact that no gasoline was found in the chemistry testing. The State elicited testimony only that "high boiling petroleum distillates" were found and describing these substances only as "accelerants." The State then repeatedly argued in opening and closing that the fire was started with gasoline, creating the impression that the finding of HPDs was consistent with a finding of gasoline. Adam's defense counsel – who apparently never understood the chromatography evidence – never presented any evidence that refuted this idea.[3] Heavy petroleum distillates are simply an entirely different category of substances from gasoline, however, comprising products such as diesel fuel, kerosene, and home heating oils. None of these products were available for purchase at the Clark gas station.

---

[3] This failure is the principal basis of Adam's claim of ineffective assistance of counsel. *See United States v. Hebshie*, 754 F. Supp. 2d 89, 120 (D. Mass. 2010) ("a reasonably competent counsel would have challenged the test results of 'light petroleum distillate' and their characterization as accelerants… 'light petroleum distillate' is such a generic category and includes so many benign chemicals that it literally has no meaning in connection with a finding of 'incendiary intent.'")

The newly-discovered fact that the HPD in the fire debris did not come from the milk jug takes the chemistry evidence a crucial step further, conclusively rebutting the State's theory that the milk jug corroborated Adam's confession. The fact that a milk jug was found in the precise spot where Adam confessed to have put one and – to all appearances – contained the same type of petroleum substance as that found in the fire debris was powerful evidence at trial. In closing argument, an Assistant State's Attorney brandished the milk jug before the jury, stating: "He goes to the Clark gas station with an empty plastic gallon of milk, this one."[4] The fact that the chemistry testing disproves both the State's theory and Adam's confession – and that the milk jug thus is actually *exculpatory* evidence – is highly significant.[5]

In addition to the facts that the chemistry results show no trace of gasoline and the HPDs in the fire debris and the milk jug do not match, other evidence presented for the first time in the Petition further establishes that Adam is innocent.

<u>First</u>, the Clark gas station attendant – Brenda Thomas – has recanted her testimony and now avers that she identified Adam only because of police pressure to do so. (*See* Dkt. 1 at 11.) Ms. Thomas' recantation is consistent with the fact that the chemistry evidence shows that no gasoline was involved in the fire and the fact that the HPDs detected could not have been purchased at the Clark station. Her recantation is also corroborated by the fact that no receipts or

---

[4] The State's actions in eliciting half-true testimony that heavy petroleum distillates were found, but not explaining that those were not gasoline, and specifically arguing that the milk jug was used to carry gasoline while knowing that was practically impossible, are the basis of Adam's misconduct claim. *See United States v. Freeman*, 650 F.3d 673, 680 (7th Cir. 2011) (due process prohibits the State from making arguments based on "half-truths and vague statements that could be true in a limited, literal sense but give a false impression to the jury") (internal quotations omitted).

[5] The milk jug had no fingerprints and photographs show it was crushed, yellowed, and covered with settled dust when found. (*See* Exs. 2 and 3, photos of the milk jug.)

surveillance tapes from the Clark station showing a purchase of $2 of gasoline at around 2:30 AM were introduced at trial.[6]  (*Id.* at 8.)

Second, the fact that only an HPD, as opposed to gasoline, was found in the fire debris leads to the further conclusion that there is no basis from the physical evidence to believe that the fire was an arson at all.  (*Id.* at 11.)  Dr. Gerald Hurst, one of the leading arson investigators in the country, explains that HPDs are not nearly as flammable as gasoline and almost certainly could not have been used by an arsonist to start the fire in this case.[7]  Hurst states that the presence of HPD in the wood debris was instead probably due to the fact that HPDs are used as solvents in common wood preservatives.  Hurst further attests that the testimony of fire investigators at trial that the burn patterns indicated the fire was an arson is now known to be entirely mistaken – indeed, was out of step with consensus standards even at the time of trial – and that no physical evidence indicates an accelerant was involved.

Third, Kasey Paris has recanted her testimony that Adam threatened her and now states that police "coached" her to misrepresent an adolescent spat as something sinister.  (*Id.*)

---

[6] The reliability of Ms. Thomas' affidavit is further demonstrated by the facts that she does not know Adam Gray and had nothing to gain by recanting her trial testimony, and that she gave her affidavit in 2006 prior to Adam obtaining expert review of the chemistry evidence that informed him that no gasoline was present.

[7] In this regard, Hurst discusses a Department of Justice study that tested the effect of igniting kerosene (which is classified as an HPD) spilled on wood flooring and found that "[t]he kerosene failed to ignite in most cases.  In some of the experiments, the kerosene did ignite in the locality of the matches and slowly spread in the confines of the cracks in the floor … The kerosene fires self-extinguished leaving large areas of the spill unburned."  (Ex. 4, Hurst Aff. at 10, *quoting* Anthony D. Putorti, "Flammable and Combustible Liquid Spill/Burn Patterns" (NIJ Report 604-00) at 7, National Institute of Justice, Washington (2001).)

Fourth, Karrie Kelly – the lone unrecanted eyewitness – has also submitted an affidavit revealing that she was on a prescription muscle relaxant the morning of the fire and that police told her an arsonist would go free if she did not make an identification. (*Id.*)

Thus, as set forth more fully in the Petition, the only significant evidence remaining against Adam is his confession – which is now known to be inconsistent with both the physical evidence and eyewitness accounts – and Karrie Kelly's identification of him as the person she saw running down the alley around the time of the fire. This evidence is insufficient to support a conviction beyond a reasonable doubt and Adam is entitled to habeas relief.

## **ARGUMENT**

This Court should find that Adam's Petition is predicated on new, timely evidence that establishes that he is actually innocent and thus that all of his claims advance through the innocence gateway together. The Court alternatively should find that each of Adam's claims is timely when considered on an individual basis. The Court further should find that fairness and economy weigh in favor of staying proceedings pending the development of additional new evidence in state court.

**I.      A Petitioner Who Establishes His Actual Innocence Based On Newly-Discovered Evidence Is Entitled To Relief From Constitutional Violations At Trial.**

Adam's Petition should be heard in its entirety because he sets forth previously-unavailable evidence of actual innocence that entitles his claims of constitutional violations at trial to be heard. The Supreme Court has held that in order to prevent a fundamental miscarriage of justice, a habeas petitioner who makes a sufficient showing of his innocence may pass through a "gateway" that permits claims of constitutional violations at trial to be heard where they would otherwise be barred by procedural defaults. *See Murray v. Carrier*, 477 U.S. 478, 495-96 (1986); *Schlup v. Delo*, 513 U.S. 298, 326-27 (1995); *House v. Bell*, 547 U.S. 518, 539 (2006).

A gateway claim of innocence thus "is procedural, rather than substantive." *Schlup*, 513 U.S. at 314. To establish a gateway claim, a petitioner must demonstrate "that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt." *Id.* at 326. While it is only the "extraordinary case" that meets this standard, the showing required is less than that necessary to establish a substantive claim of innocence. *House*, 547 U.S. at 538*, citing Herrera v. Collins*, 506 U.S. 390, 417 (1993) (assuming, without deciding, that such a claim exists).[8]

The Seventh Circuit has treated the enactment of a statute of limitations applicable to habeas petitions under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") differently from the majority of other circuits to address the issue, stating that petitioners "claiming to be innocent, like those contending that other events spoil the conviction, must meet the statutory requirement of timely action."[9] *Escamilla*, 426 F.3d at 872. Adam's Petition is

---

[8] The Court has explained that this difference is based on the premise that where a petitioner "accompanies his claim of innocence with an assertion of constitutional error at trial," his "conviction may not be entitled to the same degree of respect as one… that is the product of an error-free trial." *Schlup*, 513 U.S. at 316.

[9] The Sixth, Ninth, Tenth, and Eleventh Circuits have held that a showing of actual innocence does create a freestanding exception to the statute of limitations. *Souter v. Jones*, 395 F.3d 577, 602 (6th Cir. 2005); *Lee v. Lampert*, 653 F.3d 929, 932 (9th Cir. 2011) (en banc); *Lopez v. Trani*, 628 F.3d 1228, 1230-31 (10th Cir. 2010); *San Martin v. McNeil*, 633 F.3d 1257, 1267-68 (11th Cir. 2011). The Second and Eighth Circuits have left the question open. *Doe v. Menefee*, 391 F.3d 147, 161 (2d Cir. 2004) (Sotomayor, J.) (holding, contrary to *Escamilla*, that the canon of constitutional avoidance counsels against resolving the question where petitioner could not actually establish actual innocence); *Flanders v. Graves*, 299 F.3d 974, 976 (8th Cir. 2002). The First Circuit has expressed skepticism about the exception and the Fifth Circuit has rejected it. *Riva v. Ficco*, 615 F.3d 35, 44 n.4 (1st Cir. 2010); *Cousin v. Lensing*, 310 F.3d 843, 849 (5th Cir. 2002).

The broad statement in *Escamilla* that "'actual innocence' is unrelated to the statutory timeliness rules," 426 F.3d at 871, is itself subject to question. The opinion *Escamilla* cites for that point actually indicates that a showing of innocence *may* call for equitable tolling of the statute of limitations, as the majority of circuits have held: *Gildon v. Brown*, 384 F.3d 883, 887 (2004) (stating that the Court found "persuasive" the Eighth Circuit's caution that its decisions should

based on newly-discovered evidence under AEDPA's statute of limitations, however, and thus is fully in line with this precedent. Indeed, a Seventh Circuit opinion following *Escamilla* made clearer the distinction between a "freestanding exception" to the statute of limitations – rejected by *Escamilla* – and an innocence petition predicated on new evidence that meets the limitations period established by section 2244(d)(1)(D). *Araujo v. Chandler*, 435 F.3d 678, 681 (7th Cir. 2005); *accord Rivera v. Trujillo*, No. 10-C-7990, 2011 U.S. Dist. LEXIS 50955, at *12 (N.D. Ill. May 12, 2011) ("the only way in which Rivera's assertion of actual innocence could toll the one-year statute of limitations period would be if it were based on a factual predicate that could not have been discovered earlier through the exercise of due diligence"), *quoting Blackwell v. McCann*, No. 06-CV-06789, 2008 U.S. Dist. LEXIS 75092, at *20 (N.D. Ill. Sept. 29, 2008).[10]

It is clear that Congress' enactment of a statute of limitations was not designed to abolish the innocence gateway. To the contrary, Congress expressly adopted the gateway with respect to

---

not be read to hold "that actual innocence can never be relevant to a claim that the habeas statute of limitations should be equitably tolled"), *quoting Flanders*, 299 F.3d at 978.

Moreover, *Escamilla* is in tension with the Supreme Court's recent decision in *Holland v. Florida*, 130 S. Ct. 2549 (2010), that AEDPA's statute of limitations is subject to equitable tolling, and the Seventh Circuit has not yet revisited the issue following that case. In *Holland*, the Court held that the statute of limitations should be tolled where a petitioner's lawyer ignored the petitioner's repeated warnings that the petition needed to be timely filed. *Id.* at 2560. It would exalt procedure over substance – contrary to the very purpose of equity – for courts to hear the claims of a petitioner whose lawyer missed a deadline but refuse to hear the claims of a petitioner who is actually innocent. As the Court stated in *Holland*: "The importance of the Great Writ, the only writ explicitly protected by the Constitution, along with congressional efforts to harmonize the new statute with prior law, counsels hesitancy before interpreting AEDPA's statutory silence as indicating a congressional intent to close courthouse doors that a strong equitable claim would ordinarily keep open." *Id.* at 2562 (citations omitted).

[10] Similarly, in *Souter v. Jones* the Sixth Circuit first considered whether an affidavit from a witness who testified at trial was newly discovered, and thus constituted the "factual predicate[]" which commences the statute of limitations period," before ultimately holding that innocence is a freestanding exception to the statute of limitations. 395 F.3d at 587 & 600 n.15 (6th Cir. 2005).

successive petitions in § 2244(b)(2)(B), changing existing law only by requiring the showing of innocence in successive petitions to be made by "clear and convincing evidence." *See House*, 547 U.S. at 539. It would not make sense to construe the statute to permit successive petitions to pass through the actual innocence gateway but not first petitions. *See id.* ("dismissal of a *first* federal habeas petition is a particularly serious matter") (emphasis original)*, quoting Lonchar v. Thomas*, 517 U.S. 314, 324 (1996). As the Supreme Court stated in the course of holding that a court of appeals may recall its mandate denying a habeas petition in light of new evidence of actual innocence, "[t]he miscarriage of justice standard is altogether consistent… with AEDPA's central concern that the merits of concluded criminal proceedings not be revisited in the absence of a strong showing of actual innocence." *Calderon v. Thompson*, 523 U.S. 538, 558 (1998).

The operation of the innocence gateway based on new evidence is illustrated by a recent case out of the Eighth Circuit, *Engesser v. Dooley*, No. 10-civ-5039-KES, 2011 U.S. Dist. LEXIS 114045 (D.S.D. Sept. 30, 2011).[11] There a habeas petitioner had been convicted of vehicular homicide on the theory that he had been driving a convertible drunk when it crashed, killing a woman riding with him. The petitioner filed three unsuccessful post-conviction petitions in state court and one habeas petition asserting that he actually had been the passenger in the car and the decedent had been the driver, and arguing that his trial counsel was ineffective for failing to call two eyewitnesses who would have testified to that effect. *Id.* at *4. After a third eyewitness previously-unknown to the petitioner then came forward and also reported that the decedent had been the driver, the petitioner again sought habeas relief. *Id.* at *30. The

---

[11] Cases like *Engesser* that are in the same procedural posture as Adam's are even more unusual than the already extraordinary innocence-based habeas petition because (1) most prisoners that can establish their innocence win relief in state court, as Adam hopes to here, and (2) as explained above, most circuits have held that the statute of limitations is inapplicable to claims of actual innocence and thus that no timely factual predicate is necessary.

court found that the new eyewitness' testimony established it was more likely than not that no reasonable juror would convict the petitioner, allowing his constitutional claims to advance through the gateway. *Id.* at *41. The court then found that the petitioner's trial counsel was ineffective for failing to call the two eyewitnesses who had been available at trial. *Id.*

Similarly here, Adam has presented new evidence that shows that he would be acquitted on re-trial and his constitutional claims should be heard.

## II. The Newly-Discovered Evidence That The HPDs Do Not Match Establishes That Adam Gray Is Actually Innocent.

The newly-discovered fact that the HPD in the wood debris did not come from the milk jug is a timely factual predicate for Adam's Petition. In light of that new fact and other evidence never before presented, Adam Gray has demonstrated his innocence and is entitled to have his constitutional claims be heard.

### A. The Fact That The HPD In The Wood Debris Does Not Match The HPD In The Milk Jug Is New, Previously-Undiscoverable Evidence.

AEDPA's statute of limitations requires habeas petitions based on new evidence to be filed within one year of the "date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D). John Lentini's affidavit dated January 11, 2012, is the first evidence Adam obtained that the HPDs are different. (Ex. 5, Lentini Aff. at 13.) Gerald Hurst provided his affidavit with the same opinion on February 13, 2012. (Ex. 4, Hurst Aff. at 13.) Adam's counsel first learned that the HPDs might be different from Hurst in late March 2011. (Ex. 6, Patnaik Aff. at ¶ 5.)

Lentini and Hurst's opinion that the HPDs do not match is based on a method for analyzing the results of gas chromatography tests that was developed only in recent years, and Adam thus exercised due diligence in obtaining it. New scientific evidence is a prototypical

12

basis for actual innocence claims. *See House*, 547 U.S. at 537 (granting gateway claim based on new DNA evidence).

A brief description of the nature of gas chromatography testing is provided here to explain the new analysis that permits differentiation of HPDs. Gas chromatography works by heating a sample to separate its component chemical molecules, which are then individually guided through an electrical field and a corresponding detector that registers the current they produce. (Ex. 5, Lentini Aff. at ¶ 14.) The actual data produced by a chromatography machine is simply the strength of the current produced by each molecule. (*Id.*) This data is displayed on a "chromatogram," a line graph printed by the chromatography machine where the current is shown on the y-axis and the time each molecule passed through the detector is shown on the x-axis. (*Id.* at ¶ 15.) The peaks of the line graph thus correspond to individual chemical molecules that chemical experts can identify through reference to known standards. (*See id.* at Ex. C.)

Chemist John Lentini, a former Chair of the American Society for Testing and Materials ("ASTM") Committee on Forensic Science, explains that most forensic laboratories perform gas chromatography testing in accordance with the applicable ASTM standard, ASTM E1618. (*Id.* at ¶ 15.) That standard calls for identifying ignitable liquid residues as belonging to one of eight general classes, two of which are gasoline and petroleum distillates. (*Id.* at ¶ 43.) Petroleum distillates are further subdivided into three subclasses: light, medium, and heavy. (*Id.*) The standard states that characterization of a substance beyond a subclass "may be possible, but it is beyond the scope of the test method." (*Id.*)

Lentini explains that he was able to distinguish between two different substances classified as medium petroleum distillates for the first time in 2005 by assessing how their different evaporation rates affected their appearance on a chromatogram. (*Id.* at ¶¶ 38-43.)

13

Specifically, because lighter molecules evaporate more readily than heavier molecules, a sample that has been exposed to fire and evaporated significantly should have a relatively higher ratio of heavy molecules to light molecules. (*Id.* at ¶ 41.) Where, as here, a sample taken from fire debris has a relatively higher proportion of light molecules than a less-evaporated sample, it can be concluded that the former sample was composed of lighter molecules to begin with. (*Id.* at ¶ 40.) Lentini states that this method of distinguishing among petroleum distillates has never been published in the scientific literature, but is based on fundamental principles that have been known for decades. (*Id.* at ¶ 43.)

Dr. Gerald Hurst, another highly-accomplished chemist and fire investigator, agrees with Lentini's opinion, stating that laboratory analysts have never been trained on making distinctions among different kinds of HPDs and "even in recent years the knowledge that the two HPD in this case are different would have been unavailable to Mr. Gray without examination by a very select group of chemists in the field."[12] (Ex. 4, Hurst Aff. at 3.) Murray Shambee, the CPD crime lab analyst who conducted the original testing, also confirms that that lab "does not distinguish among substances classified as high boiling petroleum distillates and does not train analysts to make those distinctions." (Ex. 1, Shambee Aff. at ¶ 7.)

Moreover, aside from the new analytical basis for making distinctions among HPDs, the knowledge that the HPDs in the debris and milk jug are different was entirely unavailable to Adam prior to the summer of 2010, when he first received the actual chromatograms in this case through a Freedom of Information Act request. (Ex. 6, Patnaik Aff. at ¶ 3.) Since the

---

[12] Hurst received his Ph.D. in chemistry from Cambridge University in 1963, holds multiple patents from his work as a chemist, and served as the Chief Scientist for several major explosives manufacturers before beginning work as a consultant in the field of explosion and fire analysis. (Ex. 4, Hurst Aff. at Ex. A.)

chromatograms are the sole documents containing the actual data from the test, Adam obviously could not have any expert review the results of the test without them. The fact that the State never disclosed the chromatograms despite Adam's specific request for "any report and result of any and all scientific tests" is the basis for Adam's *Brady* claim. (*See* Dkt. 1 at 14.)

In light of these facts, the Court should find that Adam exercised due diligence in discovering that the HPDs found in this case are different.

**B. The Evidence As A Whole Now Establishes That Adam Gray Is Innocent.**

As set forth above, the new evidence presented in the Petition undercuts virtually the entirety of the State's case at trial. The Court should consider all of this evidence in deciding whether Adam has set forth a claim of actual innocence. *House*, 547 U.S. at 539 ("the *Schlup* inquiry [] requires a holistic judgment about 'all the evidence'") (citations omitted). The only remaining evidence tending to show that Adam is guilty of starting the fire is the confession he gave to police and Karrie Kelly's eyewitness testimony. This evidence is insufficient to sustain a conviction beyond a reasonable doubt.

Adam's confession should no longer be seen as credible in any respect. It was elicited when he was seven weeks past age fourteen, after nearly six hours of interrogation, while his mother and brother were undisputedly at the station asking to speak with him. As the Supreme Court recently stated, "the pressure of custodial interrogation is so immense that it can induce a ***frighteningly high*** percentage of people to confess to crimes they never committed. That risk is all the more troubling—and recent studies suggest, all the more acute—when the subject of custodial interrogation is a juvenile." *JDB v. North Carolina*, 131 S. Ct. 2394, 2401 (2011) (emphasis added), *citing* Drizin & Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L. Rev. 891, 906-907 (2004). The Court has also long held that the pressures

brought to bear in an interrogation are of particular concern when police actively prevent parents from seeing their children. *Gallegos v. Colorado*, 370 U.S. 49, 54 (1962) ( a "14-year-old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police"); *accord In re R.T.*, 313 Ill. App. 3d 422, 430 (1st Dist. 2000) (stating that preventing parents from seeing their children during an interrogation "suggests that, at worst, the police were trying to coerce a confession and at best that they were conducting the interrogation without due regard for the suspect's age").[13]

Aside from the general concerns with juvenile interrogations, we now know that the physical evidence in this case is entirely inconsistent with Adam's confession. While Adam confessed to using a milk jug filled with gasoline to start the fire, chemical evidence now establishes that neither the milk jug nor the fire debris contained any gasoline residue. It also cannot be the case that Adam confessed to using "gasoline" when he meant an HPD like diesel fuel or kerosene because (1) the HPD in the fire debris did not come from the milk jug, (2) the Clark gas station did not sell diesel or kerosene, and (3) chemistry experts explain that HPDs are difficult to ignite at low temperatures and frequently self-extinguish when lit. Furthermore, it cannot be the case that the police somehow picked up the wrong container, because they emphatically testified that this was the only container of any kind near the fire scene.[14] This

---

[13] *Cf. Hardaway v. Young*, 302 F.3d 757, 759-60 (7th Cir. 2002) (upholding as not unreasonable a state court finding that a fourteen-year-old's confession was voluntary despite the "gravest misgivings" where youth was interrogated for a total of ninety minutes before confessing, had extensive experience with police, and whose father was offered a ride to the station to be present during interrogation). In contrast, Adam had no prior convictions and police affirmatively prevented his family from being present.

[14] Det. Crescenzo testified as follows:

    Q: Detective, were there any other containers by the garage slab?
    A: No.
    Q: Were there any containers out there at all?
    A: No.

physical evidence is corroborated by Brenda Thomas' recantation – who now states that she never saw Adam purchase gasoline and reports being pressured to make an identification by Det. Nicholas Crescenzo, the same detective who interrogated Adam.

Given the new understanding of the sensitivity of juvenile confessions and the new physical and eyewitness evidence that disproves Adam's confession, this Court should not give it any weight.

The only remaining piece of evidence against Adam – Karrie Kelly's eyewitness testimony – is questionable on multiple grounds and is not a sufficient basis to support a conviction beyond a reasonable doubt. As set forth in the Petition, Kelly did not identify Adam by name as the person she saw or even state that that person looked familiar before picking him out of a line-up, despite the fact that she had known him. (*See* Dkt. 1 at pp. 12-13.) Between the time she saw the person in the alley and the time she viewed the lineup, Kelly had gone back to the scene of the fire where her friend Scott Sondelski and his sister Kasey Paris were publicly accusing Adam of having started the fire, accusations which likely influenced her identification. Moreover, Kelly's testimony was inconsistent with her statements to police, most notably in that she testified that the person she saw had red hair while she did not mention this detail in multiple previous interviews. (*Id.*) Kelly's new disclosure that she was on muscle relaxants suggests even more strongly that her memory of the incident was likely shaped by later events.

Kelly's testimony stands in contrast to the testimony of Mel Gonzalez, his sister Rosemary, and his mother Lita that Adam was asleep on their living room sofa and remained there until police – based on fire investigators' mistaken beliefs that the fire was an arson and now-recanted allegations from fourteen-year-old Kasey Paris – came to arrest him.

In sum, the evidence now establishes that it is more likely than not that if Adam were tried again, any reasonable jury viewing the record as a whole would have reasonable doubt.

**III.** **Each of Adam's Claims Of Constitutional Violations At Trial Are Based Directly On The Evidence That No Gasoline Was Involved In The Fire, Which Adam Obtained Within The Year Through The Exercise Of Due Diligence.**

If the Court were to find that Adam's Petition does not advance through the gateway as a whole based on the new evidence that the HPDs do not match, it still should find that each of his claims are based directly on factual predicates obtained within the past year through the exercise of due diligence. Adam's first, second, third, fourth, sixth, seventh and ninth claims[15] all rest on the critical fact that the chromatography evidence shows that no gasoline was present in the samples. (Dkt 1. at 10-17.) Adam obtained this evidence for the first time on April 22, 2011, when CPD analyst Murray Shambee signed his affidavit.[16] *See Souter*, 395 F.3d at 586 (analyzing beginning of limitations period by the dates affidavits were obtained). As discussed above, any review of the chromatography evidence was impossible until the summer of 2010 when Adam's counsel received the chromatograms for the first time through a FOIA request. Adam thus exercised due diligence in locating Mr. Shambee and obtaining an affidavit from him acknowledging that the chromatograms came from his testing and giving his opinion that the chromatograms show that no gasoline was present.

---

[15] Specifically, these are the claims (1) that Adam is actually innocent; (2) that his trial counsel was ineffective; (3) that the prosecutors committed misconduct; (4) that the State violated *Brady* by failing to disclose the chromatograms that show that no gasoline was present; (6) that Adam's Fifth and Fourteenth Amendment rights were violated by use of his objectively false, coerced confession, (7) that his appellate counsel was ineffective; and (9) that the cumulative errors at trial violated due process.

[16] Note that whether or not Adam's trial counsel could have elicited the fact that no gasoline was present by asking Shambee that question at trial is irrelevant to when he could have obtained the factual predicate for his ineffective assistance and due process claims because he did not acquire those claims until *after* trial.

Moreover, Adam's fifth claim – that police violated due process by pressuring Brenda Thomas to identify him – was also raised in a timely fashion. While Adam obtained Thomas' affidavit in 2006, (*see* Dkt. 1 at 11), he could not have brought a successful due process claim with her affidavit alone. *See Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (a due process violation based on suppressed evidence requires a showing that the evidence is material). Given the seemingly strong physical evidence against Adam that gasoline was found in the debris and the milk jug, he could not have established that the police's influence on Ms. Thomas testimony had a material effect on his conviction.

Adam's eighth claim – that the Eighth Amendment prohibits imposing a mandatory sentence of life without parole on a fourteen-year-old – is raised here in anticipation of the Supreme Court's forthcoming opinions in *Jackson v. Hobbs*, No. 10-9647 (U.S. Nov. 7, 2011), and *Miller v. Alabama*, No. 10-9646 (U.S. Nov. 7, 2011) and consideration of it should be stayed pending resolution of those cases.

## IV.    This Action Should Be Stayed To Accommodate Further Factual Developments In State Proceedings.

Even if the Court were to find that Adam's claims do not advance through the innocence gateway or that his claims are not each based upon a timely factual predicate, two other considerations weigh in favor of a stay until state proceedings conclude. First, all of the evidence uncovered since Adam's trial has been obtained without subpoena power, and further new evidence may arise in the course of discovery or hearings in the proceedings on Adam's post-conviction petition in Illinois state court. If the Court dismissed Adam's Petition, that new evidence could only be presented to a habeas court as part of a successive petition and subject to the stringent requirements of § 2244(b), which requires a showing of actual innocence to be made by "clear and convincing evidence." *See House*, 547 U.S. at 539. Adam should not be

penalized for filing Petition within one year of obtaining the evidence presented here, which he was required to do to comply with AEDPA's statute of limitations. *See De Jesus v. Acevedo*, 567 F.3d 941, 943 (7th Cir. 2009) ("§2244(d) is an independent federal rule").

In addition, the Supreme Court has held that AEDPA's statute of limitations may be waived by the State. *Day v. McDonough*, 547 U.S. 198, 211 n. 11 (2006). In a case such as this, where a fourteen-year-old was sentenced to life without parole based on what is now universally acknowledged to be mistaken arson science, prosecutors' decision to mislead the jury regarding the meaning of the chromatography evidence, a *Brady* violation that prevented the defense from having experts independently review the chromatography results, and police pressuring witnesses to give false testimony, there are substantial equitable reasons to allow Adam Gray to have – for the first time – a fair trial.

## CONCLUSION

Adam Gray's Petition is based on newly-discovered, never-before-presented facts that establish that he is actually innocent, and he thus is entitled to relief from the constitutional violations that resulted in his conviction. Fairness also counsels that this Court stay proceedings pending the resolution of his claims in state court.

Dated:  April 12, 2012                                  Respectfully submitted,

                                                        By:   */s/ R. Douglas Rees*
                                                              One of Petitioner's attorneys

Tara Thompson                                           R. Douglas Rees
Casey Potter, Law Student                               Brij B. Patnaik
Julia Kasper, Law Student                               JENNER & BLOCK LLP
THE EXONERATION PROJECT                                 353 N. Clark Street
The University of Chicago Law School                    Chicago, IL 60654-3456
1111 E. 60th Street                                     Phone: (312) 840-8662
Chicago, IL 60637                                       Fax: (312) 840-8762
Phone: (773) 702-9611                                   Email: bpatnaik@jenner.com
Email: tthompson@law.uchicago.edu

## CERTIFICATE OF SERVICE

I, Brij B. Patnaik, hereby certify that a copy of the foregoing **Memorandum In Support of Timeliness of Petition for Writ of Habeas Corpus** was served upon the following on April 12, 2012, by the Court's CM/ECF system, in accordance with the Administrative Procedures for the Case Management/Electronic Case Filing System for the Northern District of Illinois.

> Leah M. Bendik
> Assistant Attorney General
> Criminal Appeals Division
> 100 W. Randolph, 12th Floor
> (312) 814-5029
> LBendik@atg.state.il.us

Dated:  April 12, 2012

                                        By:   _/s/ Brij B. Patnaik_
                                              One of Petitioner's attorneys

Tara Thompson                           R. Douglas Rees
Casey Potter, Law Student               Brij B. Patnaik
Julia Kasper, Law Student               JENNER & BLOCK LLP
THE EXONERATION PROJECT                 353 N. Clark Street
The University of Chicago Law School    Chicago, IL 60654-3456
1111 E. 60th Street                     Phone: (312) 840-8662
Chicago, IL 60637                       Fax: (312) 840-8762
Phone: (773) 702-9611                   Email: bpatnaik@jenner.com
Email: tthompson@law.uchicago.edu