# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ADAM THOMAS GRAY, <br><br> Petitioner, <br><br> v. <br><br> JOSEPH YURKOVICH, Warden, <br><br> Respondent | No. 12-C-1743 <br><br> Honorable Milton I. Shadur |

## REPLY TO RESPONDENT'S OPPOSITION TO
## TIMELINESS OF PETITION FOR WRIT OF HABEAS CORPUS

Petitioner ADAM THOMAS GRAY, by his attorneys R. Douglas Rees and Brij Patnaik, JENNER & BLOCK, LLP, and Tara Thompson and Law Students Casey Potter and Julia Kasper, THE EXONERATION PROJECT at the University of Chicago Law School, hereby submits this reply to Respondent's opposition to the timeliness of his Petition for Writ of Habeas Corpus.

## INTRODUCTION

In his previous filings, Petitioner Adam Gray has alleged and offered substantial proof of extremely grave constitutional violations at his 1996 trial that resulted in his conviction for an arson and two murders he did not commit. The constitutional violations – the State's presentation of half-true evidence and misleading arguments to the jury, the ineffective assistance of Adam's trial counsel, a *Brady* violation, and police pressuring an eyewitness and coercing a confession – combined to produce a terribly unjust trial in which Adam was convicted based on the theory that he had used gasoline to start a fire, when the State's own testifying chemistry expert now states that he knew that the chromatography evidence was inconsistent with that theory.

At the May 31 hearing in this case, the Court noted the long period of time that has elapsed since Adam's conviction became final on direct review, and requested additional information from Adam to explain why he was unable to bring these claims before. (Dkt. 21, Tr. of 5/31/12 Proceedings at 3.) Specifically, the Court agreed with the Attorney General that Adam needed to provide affidavits from his prior post-conviction counsel – who filed a post-conviction petition on Adam's behalf in Illinois state court challenging only the constitutionality of his mandatory sentence of life without parole – that explained why they were unable to discover that the results of the gas chromatography tests showed that no gasoline was present. (*Id.* at 10.)

Adam's prior post-conviction counsel, Marc Kadish, Director of Pro Bono Activities and Litigation Training at Mayer Brown, LLP, now has provided such an affidavit. (Ex. 1, Kadish Aff.) Mr. Kadish states that he believes all the documents he saw relating to the issue of arson showed that gasoline was present. Mr. Kadish further avers that he obtained a full set of the discovery from Adam's trial and that he does not recall seeing the actual results of the chromatography tests – the raw data contained in documents called "chromatograms." Mr. Kadish explains that he and his associates at Mayer Brown even consulted an arson expert and provided him with all the documents relating to arson they had in an effort to prove Adam's innocence.

In light of this affidavit, this Reply first discusses the due diligence Adam and his attorneys have exercised to establish his innocence, and how any reasonable attorney reviewing the record would have been taken in by the State's misleading presentation of the chromatography results and believed that those results showed gasoline. The Reply then addresses the Attorney General's argument that the statute of limitations under 28 U.S.C. §

2

2244(d)(1)(D) actually began running before Adam obtained Mr. Shambee's affidavit, and that Adam's Petition is untimely on that basis. The Reply next describes why Mr. Shambee's affidavit is the factual predicate for each of his innocence-based claims on a claim-by-claim basis. Finally, the Reply addresses the timeliness of Adam's sentencing claim in light of the Supreme Court's recent decision in *Miller v. Alabama*, No. 10-9646, 2012 WL 2368659 (U.S. June 25, 2012), which held that mandatory sentences of life without parole applied to juveniles under the age of eighteen are cruel and unusual under the Eighth Amendment.

## ARGUMENT

**I.  The Affidavit From Adam's Prior Post-Conviction Counsel Establishes That The State's Misleading Presentation of The Chromatography Evidence and Failure to Disclose the Chromatograms In Violation of *Brady v. Maryland* Prevented Adam From Learning That The Chromatography Results Actually Showed That No Gasoline Was Present.**

In his Petition for a writ of habeas corpus and in his subsequent filings, Adam has pled that the State presented half-true testimony from Chicago Police Department crime lab chemist Murray Shambee and made misleading opening and closing arguments that were undeniably intended to deceive the jury hearing Adam's case into believing that the chromatography results showed the presence of gasoline.

The State called Mr. Shambee to the stand knowing – as explained above – that his opinion that the chromatography results did not show the presence of gasoline contradicted both their key eyewitness and Adam's confession to police. They then asked a series of questions designed to elicit testimony from Mr. Shambee only that the chromatography results showed the presence of "petroleum distillates," but not that Mr. Shambee did not believe those petroleum distillates to be gasoline. (*See* Ex. 2, Shambee testimony transcript.) Mr. Shambee himself then – unintentionally or not – exacerbated the misleading effect of his testimony on direct

3

examination by failing to correct Adam's woefully inept trial counsel when she proceeded to question Mr. Shambee as if the petroleum distillates were, in fact, gasoline. (*Id.* at J-58.)[1]

Following the State's misleading presentation of Mr. Shambee's testimony, in closing argument Assistant State's Attorney James Sarros seized upon the opportunity that testimony created to pass off the chromatography results as showing gasoline, brandishing the milk jug before the jury and expressly arguing that it contained gasoline: "He goes to the Clark gas station with an empty plastic gallon of milk, this one. And he goes to a black lady, and he purchases gasoline from the black lady." (Dkt. 17, Ex. 2, Trial Transcript Excerpt.)

At the May 31 hearing, the Court requested that Adam obtain an affidavit from his prior post-conviction counsel attesting to the fact that he was, indeed, deceived by the record created in Adam's case. (Dkt. 21, Tr. of 5/31/12 Proceedings, at 10.) Marc Kadish, an extraordinarily accomplished and experienced criminal defense attorney, has provided such an affidavit.[2] (Ex. 1.) Mr. Kadish states that all of the documents he had relating to the issue of arson, which included what he believed to be a complete set of discovery and a complete trial transcript, reflected the presence of gasoline at the scene. (*Id..* at ¶ 4.) As Adam's previous pleadings have shown, seemingly every other attorney to have reviewed his case was, like Mr. Kadish, taken in by the State's deception, from the trial judge to lawyers for Clark Refining and Marketing, Inc.,

---

[1] Mr. Shambee specifically testified as follows:

> Q: Now, are you familiar with the fact that substances, chemical components can be added and taken away from distillates at a refinery depending upon where the gasoline is intended to be sent?
>
> A: I'm not once again, I'm not familiar with the quote, refinery process.

[2] Adam requested this affidavit from prior counsel and submits it here because the Court expressly requested it. (Dkt. 21, Tr. of 5/31/12 Proceedings, at 10.) He insists that it should not be understood as a waiver of his attorney-client privilege over any communications or work product beyond the information contained therein.

4

who settled a wrongful death suit based on the theory that they had sold gasoline to Adam that he used in the fire. (*See* Dkt. 17 at 5-6.)

Mr. Kadish further states that he obtained what he was informed was a full set of the discovery in Adam's case from the office of the Public Defender of Cook County. (Ex. 1, Kadish Aff. at ¶ 3.) This discovery did not contain the chromatograms, however. (*Id.* at ¶ 4.)

As Adam's prior pleadings have explained, it is only by obtaining the chromatograms through a FOIA request that his present counsel was able to learn that they showed that gasoline was not present, and ultimately obtain an affidavit from Mr. Shambee attesting to that fact. (*See* Dkt. 17 at 7-8; Dkt. 15, Patnaik Aff. at ¶4; Dkt. 14, Ex. 1, Shambee Aff at ¶5.)

These facts should be dispositive of the question of the due diligence exercised by Adam[3] and his attorneys. The Supreme Court has held that the notion that "the prosecution can lie and conceal and the prisoner still has the burden to … discover the evidence" is untenable under due process.[4] *Banks v. Dretke*, 540 U.S. 668, 696 (2004). As the affidavits from Adam's prior post-conviction counsel show, that is exactly what happened in this case. The Court should thus find that Adam exercised due diligence in obtaining Mr. Shambee's affidavit.[5]

---

[3] The Attorney General implicitly acknowledges that it would have been essentially impossible for a layman like Adam to have discovered that the State misrepresented the results of a little-known and highly specialized scientific test like gas chromatography on his own, as their Response does not challenge *his* diligence, but only that of his attorneys. (*See* Dkt. 18 at 5 (asking "when did petitioner's counsel, Mr. Patnaik, who noticed the chromatograms' absence, become petitioner's attorney?").

[4] The Attorney General does not dispute that a habeas petitioner cannot be faulted for failing to discover evidence that the State both misrepresented at trial and failed to disclose in discovery. (*See* Dkt. 18 at 5-6.)

[5] The Court wondered at the previous hearing whether there was some technological advance relating to gas chromatography that enabled Adam to learn that the chromatography results here showed that no gasoline was present. (Dkt 21, Tr. of 5/31/12 Proceedings, at 10.) To be clear: it was not a technological impediment that prevented Adam from learning that no gasoline was

At the May 31 hearing, the Court discussed the idea that present counsel thought to seek out these records and challenge the gasoline assumption even though there was no evidence to suggest that avenue would be fruitful. This Court alluded to the "spark of genius" concept in patent law in describing present post-conviction counsel's actions. (Tr. of 5/31/12 Proceedings, at 4.) In reality, that is what it was. There is no basis in the law on due diligence to punish Mr. Gray because his counsel had the spark of genius to question everyone's assumptions and the State's specific misrepresentations in the case, and because new post-conviction counsel applied his specialized expertise to find evidence that developed new claims for Mr. Gray. *Banks*, 540 U.S. at 696; *see also Starns v. Andrews*, 524 F.3d 612, 619 (5th Cir. 2008) (holding that petitioner exercised due diligence in obtaining exculpatory testimony after prosecutors misled his trial counsel regarding the witness's account); *Douglas v. Workman*, 560 F.3d 1156, 1181 (10th Cir. 2009) (same).[6] Present post-conviction counsel was able to overcome the barrier put in prior post-conviction counsel's way by the State's misrepresentations, but that does not mean that prior post-conviction counsel somehow lacked diligence in failing to do so. There is no law

---

present. Indeed, the State's expert Mr. Shambee knew that fact at the time and even Adam's trial attorneys probably could have known it had they obtained the chromatograms and sent them to an expert for independent review, or if they had interviewed Mr. Shambee before trial, assuming he would have answered their questions truthfully. The reason Adam and all of his prior attorneys were unable to learn this was because of the State's deception, and Adam cannot be punished for failing to discover a lie that was buried so deeply.

On the other hand, there has been a technological advance in the art of gas chromatography that permits distinctions to be made among different kinds of heavy petroleum distillates. (*See* Dkt. 17 at 9-10.) That evidence is relevant to Adam's coerced confession claim and claim of actual innocence, as set forth below.

[6] The reason Adam's counsel requested the chromatograms in 2010 through the Freedom of Information Act was because he was familiar with gas chromatography and what chromatograms look like. (Dkt. 17 at 8 n. 6.) Even then, Adam's counsel did not have reason to believe that the chromatograms had not been disclosed in discovery until he obtained all of Adam's files from Adam's previous attorneys in May 2011 and learned that the chromatograms were not present. (Dkt. 15, Patnaik Aff. at ¶ 2.)

6

supporting this conclusion.  A rule indicating otherwise would say that if the state deliberately withholds evidence from an innocent defendant, and it takes significant time and even luck to figure that out, then the state can effectively deny that person from obtaining relief from the federal courts.  As the Supreme Court explained in another context, "a result which leaves intact a conviction obtained through a prosecution tainted by bad faith may encourage repetition of the impropriety."  *Rinaldi v. United States*, 434 U.S. 22, 31 n.17 (1977) (vacating conviction obtained in violation of *Petite* policy).

## II. The Statute of Limitations Applicable To Adam's Innocence-Based Claims Under Section 2244(d)(1)(D) Began to Run From The Date Murray Shambee's Affidavit Was Signed.

Adam's previous pleadings described how the Seventh Circuit has held that the one-year statute of limitations under Section 2244(d) begins to run when a petitioner first obtains "specific, concrete" information on which to base his claim.  (Dkt. 17 at 3-9, *citing Moore v. Knight*, 368 F.3d 936, 939 (7th Cir. 2004).)  The first actual evidence Adam had that established that the chromatography results do not show the presence of gasoline was Murray Shambee's affidavit, which was signed on May 22, 2011.  (Dkt. 14, Ex. 1.)  Nevertheless, the Attorney General argues that the statute of limitations began to run earlier, on the date Adam's attorneys first came to believe that no gasoline was present.  (Dkt. 18 at 9, *citing* Dkt. 15, Patnaik Aff at ¶4.)

The Attorney General's argument overlooks the fact that while Adam's counsel believed that the chromatograms did not show the presence of gasoline as of August 2010, it was not until Adam obtained an affidavit from Mr. Shambee, the expert who testified at trial, acknowledging that he shared the same belief that he had evidence upon which to base a claim.  It is important in this regard to recognize that any interpretation of the data produced by a chromatography test –

7

which is shown in the chromatograms – is not an objective fact, but rather a matter of expert opinion. Murray Shambee's opinion, as the opinion of the witness the State presented at trial, is the opinion that matters to Adam's claims of prosecutorial misconduct and ineffective assistance of counsel because it shows what the prosecutors knew or should have known and what Adam's trial attorneys could have elicited by asking the right questions.

In this regard, while Adam submits that there can be no reasonable doubt among experts that the chromatography results in his case show that no gasoline was present,[7] not all experts are reasonable. Had Murray Shambee actually believed that gasoline was present in this case – as his testimony seemingly indicated in the context of the trial – the State justifiably could have presented his testimony in the way they did and made the arguments they made, and Adam also might not have been able to bring a successful claim of ineffective assistance. Mr. Shambee in fact has opined in other cases that chromatography testing showed the presence of gasoline when his analysis was disputed by other scientists. (*See* Ex. 3, Maurice Possley, "1 Year Later – Still a Mystery," *Chicago Tribune*, Oct. 18, 2004.)[8]

In sum, Murray Shambee's affidavit establishes that it is undisputed that the chromatography results show that no gasoline was present, and further establishes that Mr. Shambee's opinion to that effect was available both to the State and Adam's trial counsel. It is

---

[7] In this regard, chemist John Lentini states:"[t]he aromatic compounds in gasoline create a distinctive pattern on a chromatogram that is relatively easy to identify in the absence of interfering molecules, which are not present from wood or a plastic jug." Dkt. 14, Ex.5 Lentini Aff at ¶ 23.

[8] The article explains that Mr. Shambee reported that gas chromatography testing on samples taken from the Cook County Administration Building Fire in 2004 showed the presence of gasoline, but scientists employed by the Cook County Commission investigating the incident disagreed with his findings.

thus the first "specific, concrete" factual predicate Adam obtained on which he could base his claims.[9]

### III. Murray Shambee's Affidavit Is The Factual Predicate for Each of Adam's Innocence-Based Claims.

Adam's Petition sets forth nine claims. Eight of these claims assert constitutional violations at trial and one claim relates to sentencing. This section addresses how each of the eight innocence-based claims are predicated on Murray Shambee's affidavit. These arguments were made in Adam's previous filings, (*see* Dkt. 17 at 11-16; Dkt. 14 at 18-19), and Adam attempts to expand upon those arguments here.

#### A. Mr. Shambee's Affidavit Is The Factual Predicate for Petitioner's Ineffective Effective Assistance of Counsel Claim.

Adam's claim of ineffective assistance of trial counsel is primarily based on the fact that his attorneys never understood that the gas chromatography results showed that no gasoline was present in the debris or the milk jug, a fact that could have been used both to undercut the State's theory of the case and ultimately to establish that there was no basis in the physical evidence to believe that the fire was an arson at all. (Dkt. 1 at 12; Dkt. 14 Ex. 4, Hurst Aff. at 12.) Adam's ineffective assistance claim thus is predicated on Mr. Shambee's affidavit, which shows that

---

[9] Petitioner further submits that the court should consider a second date as the factual predicate for his innocence-based claims: the date in which Adam first had reason to believe that the chromatograms had not been turned over in discovery, which was May 2011. It was in that month that Adam's current counsel first received a full set of files from his post-conviction counsel in May 2011 and learned that the chromatograms were not present there. (Dkt. 15, Patnaik Aff. at ¶2.) It was not until that date that Adam's current counsel knew that Adam could not previously have submitted the chromatograms to an expert and learned that they showed no gasoline. Adam's counsel previously had been informed that the Public Defender's office was unable to find Adam's entire file. (Ex. 4, Letter from C. Marchigiani to B. Patnaik, November 20, 2010.)

Adam's trial counsel could have conclusively established that fact simply by asking him. (Dkt. 14 Ex. 1, Shambee Aff.)

Learning that there was no gasoline in the samples also serves as the factual predicate for the part of Adam's ineffective assistance claim that alleges that trial counsel failed to sufficiently challenge Karrie Kelly's trial testimony. Trial counsel failed to challenge Kelly's trial testimony that she saw Adam Gray in the alley running from the scene of the fire with a white bag in his hand. (Dkt. 1 at 12-13.) If Adam's trial counsel had elicited testimony that gasoline was not in the fire debris or milk jug, then they could (and should) have gone on to challenge Kelly's testimony about what she saw. Specifically, counsel could have elicited a more detailed description of the bag and asked whether she saw the person drop the white bag in the alley. It was only after Adam learned that gasoline was not in the fire debris or milk jug that he had reason to question whether the milk jug was even connected to the fire, and thus whether trial counsel should have asked Kelly more about the white bag. In other words, he did not know that trial counsel failed to ask essential questions until he learned that there was no gasoline in the samples.

It is important to recognize that a habeas petition can be predicated on newly-discovered evidence of ineffective assistance where a petitioner learns that the ineffective assistance was induced by the State's misrepresentations. *See Starns*, 524 F.3d at 619 (holding that a habeas petitioner presented newly-discovered evidence of ineffective assistance after prosecutors induced his attorneys not to interview a witness by misrepresenting the witness's account). Here, the State misled Adam's trial counsel to believe that the chromatography results showed the presence of gasoline by expressly stating exactly that at his juvenile hearing and failing to

disclose the chromatograms. (*See* Dkt. 17 at 5 and Ex. 1.) Under these circumstances, a claim of ineffective assistance of counsel may proceed on habeas review.[10]

    **B.    Murray Shambee's Affidavit Is The Factual Predicate For Adam's Prosecutorial Misconduct Claim Under *Napue v. Illinois* and the Fifth and Fourteenth Amendments.**

Adam's third claim is that the trial prosecutors violated his right to due process by knowingly presenting misleading evidence and argument that the fire was started using gasoline. (Dkt. 1 at 13-14); *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Murray Shambee's affidavit is the factual predicate that renders this claim timely under section 2244(d)(1)(D). As discussed above, Mr. Shambee's affidavit establishes that prosecutors knew or should have known that Mr. Shambee's opinion was that no gasoline was present, but elicited testimony that concealed that fact.

Adam could not have discovered the factual predicate for this claim earlier because Shambee's testimony seemed to indicate that he actually believed gasoline had been found and the State did not disclose the chromatograms that ultimately allowed Adam to prove otherwise. (Ex. 1, Kadish Aff. at ¶ 4.) Thus, the arson expert prior post-conviction counsel consulted was not able to review the complete set of records, and no information available to prior post-conviction counsel would have given them any reason to believe that they were missing key documents in the case or that there was any reason to doubt the testimony regarding the chromatography results at trial.

    **C.    Murray Shambee's Affidavit Is Part of The Factual Predicate for Adam's *Brady* Claim.**

---

[10] The analysis in this section applies equally to Adam's claim of ineffective assistance of appellate counsel. (*See* Dkt. 17 at 15.)

Adam's fourth claim, that the state committed a *Brady* violation by failing to disclose the chromatograms and Mr. Shambee's laboratory notes, is predicated in part on Mr. Shambee's affidavit and in part on Adam's discovery that the chromatograms were not turned over in discovery. (Dkt. 1 at 14.) The chromatograms contain exculpatory evidence because they are the basis for the opinions of Mr. Shambee, Mr. Lentini, and Dr. Hurst that no gasoline was present in the debris or milk jug, and thus they should have been disclosed in discovery under the *Brady* rule. With respect to the *Brady* prejudice analysis, while it is true that Adam's trial counsel probably could have learned Mr. Shambee's opinion simply by interviewing him before trial and asking him whether gasoline was present even without the chromatograms, Adam's counsel was prevented from pursuing any other means of obtaining such an opinion. That is substantial prejudice. After the State had expressly misrepresented Mr. Shambee's findings in Adam's juvenile transfer hearing, deceptively argued that gasoline was used in the fire in opening argument, and then called Mr. Shambee to the stand and elicited half-true testimony that did not acknowledge the critical fact that no gasoline was found, Adam's counsel could not have been expected to uncover the truth.[11] *See Starns*, 524 F.3d at 619.

In addition, the chromatograms reveal that Mr. Shambee conducted two separate tests on the samples, one of which was preferentially oriented towards detecting gasoline. (Dkt. 1 at 14; Dkt. 14 Ex. 5, Lentini Aff. at ¶ 27.) The fact that this test was performed and came back negative could have been used by the defense to further solidify the conclusion that no gasoline was present. (Dkt. 1 at 14-15.) Mr. Shambee did not mention this second test in his trial testimony, and thus there was no way to know that it had been performed without reviewing the chromatograms. (*Id.*) Furthermore, Mr. Shambee's laboratory notes contain exculpatory

---

[11] In this regard, Adam's *Brady* claim is an alternative to his ineffective assistance claim.

information that could have been used to rebut testimony from a CPD detective that the milk jug smelled like gasoline. (*See* Dkt. 1 at 15.) The notes state that the smell of the milk jug instead was "unidentifiable." (Dkt. 14, Ex. 5, Ex. A at 38.) Adam could not have brought these aspects of his claim until he obtained Mr. Shambee's affidavit verifying that the laboratory notes were actually his. (Dkt. 14 Ex. 1, Shambee Aff. at ¶3.)

Adam's *Brady* claim is also predicated on the fact that the State had not turned over the chromatograms in discovery, which Adam's present counsel did not learn until he received the full case file from Adam's prior post-conviction counsel, in May 2011. (Dkt. 15, Patnaik Aff. at 2.) Adam's prior post-conviction counsel had what they believed to be the full case file. (Ex. 1, Kadish Aff. at ¶3). Adam's present counsel had only been able to obtain an incomplete file from the office of the Cook County Public Defender, as that office was not able to locate the complete file. (Ex. 4, Letter from C. Marchigiani to B. Patnaik, November 10, 2010.) Prior to obtaining the full file from Adam's prior post-conviction counsel, Adam's present counsel had no reason to believe that the chromatograms had not been disclosed in discovery.

> **D.    Murray Shambee's Affidavit Is Part of the Factual Predicate for Adam's Claim of Coerced Identification Under the Fifth and Fourteenth Amendments.**

Adam's fifth claim argues that the state committed a *Brady* violation by failing to disclose that police pressured Clark gas station attendant Brenda Thomas into falsely identifying Adam Gray as buying gasoline at a nearby gas station the night of the fire. (Dkt. 1 at 15.) The state presented Ms. Thomas as a witness and used her testimony to bolster its argument that Adam used this gasoline purchase to set the fire. A friend of Adam's obtained an affidavit from Ms. Thomas in January of 2006 recanting her trial testimony and explaining that she was pressured into falsely identifying Adam.

Although Adam first knew that Ms. Thomas recanted in 2006, he did not have sufficient evidence to present his *Brady* claim until he obtained Murray Shambee's affidavit explaining that gasoline was not found in the milk jug or at the scene of the fire. In order to exhaust this claim Adam first needed to raise it in the Illinois courts, and in Illinois there is a significant body of caselaw explaining that recantations are disfavored and that new trials will not be granted on that basis except in "extraordinary circumstances." *See*, *e.g.*, *People v. Steidl*, 177 Ill.2d 239, 260 (1997). To obtain relief on a *Brady* claim a court has to conclude that exculpatory information was not disclosed, meaning in this case that a court must believe the assertion in Ms. Thomas' affidavit that she was coerced into falsely identifying Adam as a person who purchased gasoline from her. Relevant, and indeed critical to that analysis, is an understanding that this fire was not started using gasoline, which gives Ms. Thomas' recantation materiality that it does not have standing alone. So, although Adam knew in 2006 that Ms. Thomas had recanted, he did not have a sufficient factual predicate to bring a *Brady* claim on that recantation until 2011, when he could support Ms. Thomas' bare assertion with substantial proof.

The Attorney General argues that "[t]he question under §2244(d)(1)(D) is not when petitioner accrued sufficient evidence to *succeed* on a claim, but when the petitioner could have discovered the important facts *underlying* the claim." (Dkt. 18 at 13-14, emphasis original.) That argument would turn the statute of limitations into an insuperable obstacle for petitioners like Adam whose convictions were based on multiple constitutional violations that can only be uncovered one by one. Such a petitioner cannot be required to bring a futile claim merely to comply with the statute of limitations. For instance, a petitioner who has been tortured into giving a false confession knows the facts underlying his coerced confession claim – that he was tortured – as soon as his confession is used at trial, but that knowledge would not bar him from

later bringing a claim based upon strong corroborating evidence. *See People v. Wrice*, 930 N.E.2d 102, 111 (Ill. App. 1st Dist. 2010).

> E. **Murray Shambee's Affidavit Is Part of the Factual Predicate for Petitioner's Claim That His Coerced Confession Was Wrongly Used Against Him in Court Under the Fifth and Fourteenth Amendment.**

Adam's sixth claim, that his right to due process and the privilege against self-incrimination was violated by police coercing his confession, is predicated on the facts that no gasoline was present in the milk jug or fire debris. (Dkt. 1 at 16-17.) It is also based in part on John Lentini and Gerald Hurst's expert opinions that the heavy petroleum distillate that the chromatography testing detected in the milk jug is not the same as the heavy petroleum distillate detected in the debris. (Dkt. 14, Ex. 4 at 13 & Ex. 5 at 13.)

To add to what Adam has argued above with respect to the lack of gasoline at the fire scene and in the milk jug, Adam also exercised due diligence in obtaining the evidence that the HPDs in the milk jug and the debris are different. First, these experts' review of the chromatography data was impossible until Adam obtained the chromatograms in 2010. (*See* Dkt. 17 at 10.) More importantly, however, the technique for making distinctions between HPDs was developed by John Lentini for the first time in 2005 and has never been published. (Dkt. 14, Ex. 5 at ¶ 43.) Thus, Adam literally had no way of knowing that such distinctions could be made and was simply fortunate that he happened to contact Lentini and Hurst, chemists at the forefront of their field.[12]

As Adam explained in his second filing, a federal magistrate judge in California concluded that Lentini's technique was previously unavailable and thus that his opinion that two medium petroleum distillates ("MPDs") were different constituted newly-discovered evidence

---

[12] The advance made by Lentini is described more fully in one of Adam's previous filings. (Dkt. 14 at 12-15.)

for purposes of § 2244(d)(1)(D). (Dkt. 17 at 10); *Souliotes v. Hedgpeth*, No. 1:06-cv-00667, 2012 WL 1458087, at *60-64 (E.D. Cal. Apr. 26, 2012). In *Souliotes*, the State agreed with Lentini's opinion that an MPD found on the petitioner's shoes did not match an MPD found inside the house he had purportedly burned down. *Id.* at *3. The State, argued, however, that the petitioner could have obtained a similar opinion earlier and thus was insufficiently diligent. *Id.* at 5-6. Magistrate Judge Michael Seng rejected this argument, finding that the State was unable to show that the methodology for differentiating MPDs has ever been published and could not even point to any other instances in which such differentiation had been performed. *Id.* at *63. Magistrate Judge Seng thus found that the petitioner in that case had exercised due diligence. The Court should reach the same conclusion here.

### F. Murray Shambee's Affidavit Is Part of The Factual Predicate For Adam's Actual Innocence Claim.

Finally, as set forth in prior filings, Adam's claim of actual innocence is, like his coerced confession claim, based both on the facts that no gasoline was present and that the HPD in the fire debris is not the same as the HPD in the milk jug. As discussed in these pleadings and others, these are factual predicates that were discovered within the last year, and that Adam exercised due diligence in uncovering and presenting to the court.

### G. Murray Shambee's Affidavit Is Part of the Factual Predicate for Adam's Cumulative Error Claim Under the Due Process Clause.

Adam's final innocence-based claim is that the cumulative errors in his trial collectively deprived him of due process of law. This claim is also based both on the facts that no gasoline was present and that the HPD in the fire debris is not the same as the HPD in the milk jug.

## IV. Adam's Claim That His Mandatory Sentence of Life Without Parole For A Crime He Was Convicted of Committing At Age Fourteen Is Now Timely Under 2244(d)(1)(C).

As mentioned above, the Supreme Court last month held that the Eighth Amendment prohibits applying a mandatory sentence of life without parole to a juvenile under age eighteen. *Miller v. Alabama*, No. 10-9646, 2012 WL 2368659 (U.S. June 25, 2012). Adam received such a sentence for a crime he was convicted of committing at age fourteen, and his sentence is thus unconstitutional.

28 U.S.C. § 2244(d)(1)(C) provides that a one year statute of limitations begins to run on claims predicated on newly-recognized constitutional rights from "the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review." The Supreme Court in *Miller* clearly recognized a new Eighth Amendment right of juveniles to be exempt from mandatory sentences of life without parole. *Miller*, 2012 WL 2368659, at *12. Furthermore, the *Miller* decision actually resolved two cases, *Miller* itself and *Jackson v. Alabama*, the latter of which was a case on collateral review. *Id.* at *5. The Supreme Court thus clearly held that the right it announced was retroactively applicable and Adam's claim under *Miller* is thus timely.

## V. If The Court Has Further Questions Regarding The Timeliness of Adam's Claims, It Should Enter A Stay Pending Further Factual Development in State Court or Hold An Evidentiary Hearing To Resolve Those Questions.

As the Court stated in the first hearing in this case, it is appropriate to enter a stay where a petitioner has made a "threshold" showing of timeliness, and that showing of timeliness does not have to be in the nature of a summary judgment showing. (Dkt. 20, Tr. of 3/22/2012 Proceedings at 4.) As the Court has also stated, the statute of limitations creates an affirmative

defense on which the State bears the burden of proof.  (Dkt. 21, Tr. of 5/31/12 Proceedings at 4); *Gildon v. Brown*, 384 F.3d 883, 887 (7th Cir. 2004).   While a threshold showing is all that is required and the Attorney General has presented no evidence that indicates Adam's claims reasonably could have been raised at any time before, Adam has made a substantial showing of timeliness which should entitle him to a stay.

Adam has submitted extensive filings in the Circuit Court of Cook County and fully believes that he is entitled to and will receive relief there.  (*See* Ex. 5, Amended Petition for Post-Conviction Relief.)  The factual issues in this Court's timeliness determination overlap with the factual findings the state court must make in resolving Adam's pending state court post-conviction petition.  Adam must, for instance, likely demonstrate cause and prejudice for failing to bring his state post-conviction claims earlier.  *See* 725 ILCS 5/122-1.  This issue is inextricably bound up with the question of when Adam could have discovered and brought his present federal habeas claims.  Staying these federal proceedings thus will allow this Court to give appropriate deference to the lower court's factual findings on these issues, as AEDPA directs.  *Sanchez v. Gilmore*, 189 F.3d 619, 623 (7th Cir. 1999).

In the event that this Court concludes that there remain unresolved factual issues after this filing that must be answered in the course of this Court's timeliness determination, then Adam respectfully requests that this Court hold a limited evidentiary hearing for the purpose of resolving these issues.  This evidentiary hearing could be conducted through narrow, limited depositions or through live testimony before the Court to provide answers about any remaining questions the Court may have.[13]

---

[13] In requesting such a hearing in the event that this Court believes there are still open factual questions to resolve, Adam does not waive his attorney-client privilege with prior and present

Dated: July 12, 2012                                      Respectfully submitted,

                                                     By:  */s/ R. Douglas Rees*
                                                          One of Petitioner's attorneys

| | |
|---|---|
| Tara Thompson | R. Douglas Rees |
| Casey Potter, Law Student | Brij B. Patnaik |
| Julia Kasper, Law Student | JENNER & BLOCK LLP |
| THE EXONERATION PROJECT | 353 N. Clark Street |
| The University of Chicago Law School | Chicago, IL 60654-3456 |
| 1111 E. 60th Street | Phone: (312) 840-8662 |
| Chicago, IL 60637 | Fax: (312) 840-8762 |
| Phone: (773) 702-9611 | Email: bpatnaik@jenner.com |
| Email: tthompson@law.uchicago.edu | |

---

post-conviction counsel, and continues to believe that his attorneys' work product privilege should remain intact without a court appropriately ordering disclosure.

# CERTIFICATE OF SERVICE

I, Brij B. Patnaik, hereby certify that a copy of the foregoing **Reply to Respondent's Opposition to Timeliness of Petition for Writ of Habeas Corpus** was served upon the following on July 12, 2012, by the Court's CM/ECF system, in accordance with the Administrative Procedures for the Case Management/Electronic Case Filing System for the Northern District of Illinois.

> Leah M. Bendik
> Assistant Attorney General
> Criminal Appeals Division
> 100 W. Randolph, 12th Floor
> (312) 814-5029
> LBendik@atg.state.il.us

Dated: July 12, 2012

By: */s/ Brij B. Patnaik*
One of Petitioner's attorneys

Tara Thompson
Casey Potter, Law Student
Julia Kasper, Law Student
THE EXONERATION PROJECT
The University of Chicago Law School
1111 E. 60th Street
Chicago, IL 60637
Phone: (773) 702-9611
Email: tthompson@law.uchicago.edu

R. Douglas Rees
Brij B. Patnaik
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Phone: (312) 840-8662
Fax: (312) 840-8762
Email: bpatnaik@jenner.com